## Gill v. Board of Education of Carter County.

Nov. 14, 1941.

As Modified and Extended on Denial of Rehearing Dec. 19, 1941.

792

H. R. Wilhoit for appellant.

S. S. Willis, Thomas S. Yates, W. W. Jayne and W. H. Counts for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

On March 7, 1941, appellee divided Carter County into subdistricts for the purpose of submitting the question of levying a tax of 25c on the taxable property in each area for local school purposes, including transportation, for a period of six years. The question submitted followed substantially the language of the statute, Section 4399-12, though counsel for appellant complains that it was not proper in form or substance. It read in part: "Are you in favor of authorizing the * * * Board to ask the fiscal court" to levy the tax as indicated above; we dispose of the objection by saying it is very unlikely that any voter may have been confused, or gained the idea that an answer "Yes," did not authorize the levy, but only directed the Board to "ask" the fiscal court to make the levy; since under the law the fiscal court had the sole power to levy on the request of the Board, we conclude that the question was submitted substantially according to the law.

The election was held on the day fixed, the returns showing 705 votes for and 258 opposed. Within time and manner provided by Section 1596a-17, Kentucky Statutes, appellant, a resident taxpayer fully qualified

thereunder so to do, filed a contest suit making the County Board defendant. He sought to invalidate the election, because it was not so conducted as to allow the "free expression of the will of the voters," and the "unfair or illegal conduct of the election" (Section 1596a-17, Kentucky Statutes), in violation of Section 6 of our Constitution: "All elections shall be free and equal," which provision we forcefully applied in Smith v. Kelly, 248 Ky. 370, 58 S. W. (2d) 621 (school), and Hocker v. Pendleton, 100 Ky. 726, 39 S. W. 250 (local option).

Appellant alleged that the created subdistrict (No. 1) contained twelve voting precincts where the voters embraced in the subdistrict were accustomed and required to vote. The order calling the election, followed by notice, limited the voting to school houses in Hutchins, Shell Rock and Willard. It is complained that neither in the order nor in notice were the voters in the boundary advised as to which place they should repair in order to vote. It is argued that according to statutes the voting should have been held at each of the regular precincts within the subdistrict.

Again, it is contended that the Board appointed as election officers, some teachers in the schools who were strongly in favor of and openly working for the proposed levy; busses furnished for the transportation of pupils were used on election day to carry to and from the polls voters favorable to the levy. The election officers were not furnished with copies of registration lists so as to show who were qualified voters, thus permitting nonqualified voters to vote favorably on the question. There was no showing that this actually occurred, though there may have been such opportunity.

It is charged that the election officers were not sworn; notices were not posted in portions of the boundary. Further, that in the boundary there were 5,000 qualified voters, and because of the limited number and location of voting places, and the complicated question, there was slowness in voting, much confusion and congestion, resulting in persons entitled to vote being denied the privilege, the "slow vote" being due in part to the attitude of officers in voting the contras slowly. We may have overlooked some allegations of unfairness, but the details above are sufficient to bring the main questions to consideration.

794

Appellee denied, and affirmatively plead that the election "was duly and legally called and conducted in accordance with the law, and the orders of the board, held at times and places ordered, and all legal voters desiring to vote were allowed to do so, and returns duly certified and results ascertained in the manner provided." Controverting reply joined the issue. The court overruled general and special demurrers. The latter plea was based on the ground of defect of parties, since the County Board was made defendant, whereas, as is contended, the subdistrict to be affected was the necessary party. Section 1596a-17, Kentucky Statutes. The contention is more technical than substantial. The boundary was laid out solely for the purpose of ascertaining the will of the voters on the proposed question. It was to become a subdistrict only for the purpose of levying and collecting the tax, Kentucky Statutes, Section 4399-12.

It is not shown that there were subdistrict trustees upon whom service might have been had, and it could hardly be contended that the voters in the boundary should have been made parties. The proposed boundary was composed of Educational Divisions 1 and 2, represented on the Board. Since the Board is the only body with power to conduct the election, certify the result and demand the levy, it was not only a proper but necessary party.

The chancellor held the election valid and dismissed the petition. There were thirty or more witnesses testifying for contestant, it being admitted that each was opposed to the levy; some had voted contra; others who had not voted for various reasons. The volume of proof was lessened by a stipulation to the effect that:

(1) The question was in form as set out in the petition, and was submitted viva voce. (2) At Hitchins and Willard some election officers were employees, or prospective employees (teachers) of the Board. (3) There were no registration lists at any of the voting places. (4) The election was called to be and was held in Hitchins, Shell Rock and Willard school houses, all in the boundary which included twelve regular voting places. The records show that in these twelve precincts there are 5,016 registered voters, including voters in three precincts within the boundary of the Grayson inde-

pendent school district, which latter, proof fairly established by estimate contained about 400 voters.

In view of the facts admitted it is hardly necessary to go into detail in recounting testimony, except in so far as it may, as we think it does, manifest that the election was not held in such a way as to permit free expression. We do not mean to say that there is such evidence as would warrant the inference that fraud was practiced. The record shows an effort on the part of the Board to follow what it believed to be applicable statutory provisions relating to school tax elections; it is argued that this being true the result should not be disturbed since the vote cast shows a fair expression of the will of the voters. This may be true as to those voting, but the fundamental question here is whether or not, under the facts and circumstances, voters had fair opportunity to express that will; this aside from what may be said as to failure to comply with what we deem to be controlling statutes in elections of the sort in question, which after all are as important to the citizen as elections choosing public officials.

It appears that the Board had divided the entire county into three subdistricts for the purpose of submitting the same question of levy, on the idea that Section 4399-12 so required. In the boundary in question there were more than 4,000 registered voters. In the other subdistricts the number of voters is not shown. The records of the Secretary of State's office show that in 1940 the total vote in Carter County was 7,623; this would indicate that the other two boundaries had about 3,500 voters.

The proof shows that a number of voters living in the upper eastern part of the county voted at Shell Rock, in some cases 10 to 12 miles from the residence of the voter, a number of whom had no means of getting to the polls. Some in this portion of the county voted regularly at Grayson. Hitchins is 4½ miles from Grayson; Willard is about the same distance. Several testified that voters living near Geigerville or Wilson in order to vote would have to travel first to Grayson thence to Hitchins, a distance in some cases of 15 or more miles. Some of these voters learning by notice, and some otherwise, went to Grayson to vote; finding that the election was being conducted at Hitchins, and

having no means to get to the latter point, returned to their homes.

Several of the witnesses testified that there were not, or that they had not seen, notices posted in their parts of the subdistrict. Some did not take either of the newspapers published in the county. One voter who lived in the Willard precinct and had voted there, said he had to go to Hitchins to vote—why so he does not say.

There is some testimony of electioneering for the levy at the polls by persons connected with the schools, or in the employ of the Board, and it is said that the officers who were recording votes, by their conduct of undue electioneering with contrary voters, delayed the voting. These minor matters are brought in to show not that the vote cast was not a fair and free expression, but that the efforts of the officers were to some extent exercised with unfairness.

The superintendent of schools published the notice once in each of the newspapers in the county, one at Grayson and the other at Olive Hill. He also posted one on a store; one on a tree in front of another store, and one at the schoolhouse, all in Hitchins; one at the church house at Shell Rock, another at the schoolhouse at Willard, and one on the bulletin board of the court-house in Grayson, and "perhaps at other places." There was public discussion favorable to the tax by three or four speakers, but apparently most of it at Hitchins.

Without undertaking to cast reflection, it might appear in view of the fact that witnesses say they saw no notices posted in the (apparently) complaining part of the district, and it is not shown that notices were so posted and no speakings held there, that Hitchins was somewhat favored. We do gather from the record that the part of the district in which the vote was taken is the most thickly populated; that Hitchins' voters were very much interested, and in the main favorable to the proposal.

Counsel for appellant does not insist that in respect of posted notices and newspaper advertisements, the strict letter of the law was not met. The statute, supra, provides that not less than 15 days before the election notice must be given by written or printed post-

ers "posted at not less than two public places in each subdistrict concerned, and by one insertion of the notice in a newspaper:" These requirements were fulfilled according to the letter of the law. However, as we read the record, subdistrict No. 1 was made up not only of 12 precincts, but of two separate educational divisions, not defined.

It may be doubted that the legislature in providing for a tax election had in mind the creation of a subdistrict for that purpose, the boundary of which might be as large as the one here, and with such a great number of voters. However that speculation may be, the most we can say in respect of notices, is that in strict fairness the upper or northerly portion of the county might have had one or two of the three notices posted at Hitchins.

It is not denied that at least two busses in use by the Board, provided under the law for the transportation of school pupils, were used to transport to and from the polls. Apparently none was sent to the remote part of the county. There may be nothing inherently vicious in such use, but the complaint is, and it has some basis, that the drivers of the busses were instructed to and did transport voters favoring the proposition. There is no showing that this was carried on to any extent. Any criticism on this score might have been, and may hereafter be avoided by confining the use of the busses to the purpose for which the taxpayers provide them.

Neither is there any law, so far as observable, which would preclude an employee of the Board from serving as election officer, but in order to avoid this sort of criticism, other and impartial persons qualified would serve all purposes, and all our election laws evince the purpose of giving all parties representation, and Section 4399-25 frowns on electioneering by any officer.

The pleadings and argument of counsel for appellant, however, raise other interesting questions. It is contended that since the election was not conducted in conformity with applicable statutes, it was invalid. Hughes v. Roberts, 142 Ky. 142, 134 S. W. 168, Ann. Cas. 1912D, 148, though in some cases we have held substantial compliance to suffice. Gibson v. Anderson, 170 Ky. 664, 186 S. W. 497. The position of appellee is that contestant, or others, conceiving that in any respect preliminary matters leading up to the election were being

done contrary to law, were relegated to equitable relief by way of injunction, a method followed in Smith v. Kelly, supra, but which did not so hold. On the other hand, we apparently undertook to do substantial justice without giving consideration to the nature of the relief sought and granted. Section 1596a-17 specifically provides for a contest. We find no case holding that failure to object to the proposed manner of holding an election waives the right to contest.

Appellee apparently limits this argument to some specific matters set up in the pleading, but there are other matters involved, which may be now noted. The election here was held viva voce; careful reading of existing statutes leads to the conclusion that it should have been held by secret ballot. As bearing on this and other matters discussed, we observe that Section 4399-25, Kentucky Statutes, relating to machinery and method of electing members of County Boards, in part provides:

> "The general election laws of the Commonwealth of Kentucky shall apply in all school elections as set out in this act."

The act is Chapter 65 of the Acts of 1934, which was intended to be and is a complete codification of the school laws. Section 4399-12 does not provide, directly or indirectly, how the election shall be conducted, except as therein stated.

Section 1446, Kentucky Statutes, provides that all elections shall be by secret ballot, save and except elections in common school districts, and in conformity therewith and as allowed by Section 155 of the Constitution, the legislature in prior laws relating to school elections, and particularly one to take the sense of the voters on a taxing question, had provided for a viva voce election, but Section 4399-12 does not so provide.

Sections 4459, 4460, Kentucky Statutes 1930, providing for the levy of taxes for "local school purposes," including transportation, provided that the vote should be taken viva voce. However, the all-embracing Act of 1934 specifically repealed those sections, and in lieu enacted Section 4399-12, current Statutes. Section 1459, Kentucky Statutes, provides that whenever a constitutional amendment, or other public measure is proposed to be voted upon by the people, the substance of such

public measure, shall be clearly indicated upon the ballot, with spaces provided for the stamping of the choice of the voter in blanks opposite the words "Yes" or "No." This seems to be provided in Section 4399-47, and is mentioned in Mollette v. Board of E. of Van Lear Graded Dist., 260 Ky. 737, 86 S. W. (2d) 990. Then follows specific directions for duties of certain officers in respect of the constitutional amendment, without any directions as to who shall act, or what shall be done when "any other public measure is to be or is submitted."

In the absence of any hint at method or manner in Section 4399-12, this statute being a part of the general elections laws, should apply. Section 1596a-17, which provides right of contest in a public question, contemplates the use of ballots. It is impressive to note that the legislature in providing for other school elections directed election by secret ballot. Section 4399-8, subdistrict trustees; Section 4399-25, members of the Board of Education; Section 4399-47, bond issue, which provides:

"[This election] shall be * * * carried out in the school district in all respects as required by law for elections in this Commonwealth, * * * by the same officers and in all other respects as required by the general election laws of the Commonwealth,"

though there is, in the last named section, no specific requirement for secret ballot.

Since we have concluded that the election authorized by Section 4399-12 must be held as required by the general laws, except in particulars later noted, it follows that the officers of the election should supply themselves with copies of the registration books, same to be furnished by the proper officers, in order that those conducting the election may ascertain who are qualified to vote. Section 1486bb-2 provides that any person otherwise qualified, and who is a registered voter, shall be entitled to vote for all officers elective by the people, and on all measures or questions submitted for determination by the voters at any regular or special election.

Section 1486bb-7 requires the clerk to deliver the copy of the registration list to the precinct officer at each primary, general or special election. What is true as to the foregoing must also apply to ballot boxes, but there should be no difficulty or inconvenience in this re-

spect, since under other sections of the school Code they are supplied for Board member elections, and subdistrict trustees.

What is intended to be held, as a general proposition, is that the election held under Section 4399-12 should have been held in conformity to and with the general election laws, except as is otherwise provided in Section 4399-12. The Board may fix the hours of election; it may give notice as provided in the section. It may also fix the date and select and name place or places where the vote is to be taken, and may appoint officers to conduct the election, three, rather than four, as provided by general laws, and perform any act relating to the election as is provided in the statute. In naming the places of voting they are not required to denominate the regular voting places; confusion might be avoided if this were done, if practicable and feasible, with regard to territorial boundary.

Section 4399-12 does not expressly provide who shall notify the county clerk of the necessity for ballots and paraphernalia. This officer should have notice and request therefor in reasonable time for him to prepare and supply them, and such notice and request should be given and made by the chairman or secretary of the board in time to allow preparation and delivery. The same section places the duty on the board ordering the election to name at least three legal voters of the district to serve as election officers. This does not mean that the board may not appoint four officers as provided in general laws. The statute contemplates that such as are appointed should function as judge, sheriff and clerk in case of appointment of three election officers. If this be done, then there is no difficulty as to the proper delivery of ballots and paraphernalia to the proper officer, nor as to what officer shall indorse the 'ballots in the manner provided. The law provides that two of the officers of the election shall decide disputed matters. The board should bear the expenses of the election.

We have manifested above that the election in question was neither fairly conducted nor conducted in accordance with applicable laws. It follows that the judgment should be reversed with directions to set it aside, and for entry of judgment holding the election illegal.

Judgment reversed. The whole Court sitting.